BYE, Circuit Judge,
with whom MURPHY, MELLOY, SMITH, and SHEPHERD, Circuit Judges, join.
Gregory Wersal, a candidate for Justice of the Minnesota Supreme Court, filed an action challenging three provisions of the Minnesota Code of Judicial Conduct — the “endorsement,” “personal solicitation,” and “solicitation for a political organization or candidate” clauses — as unconstitutionally infringing on the First Amendment rights of judicial candidates. After the parties filed cross-motions for summary judgment, the district court[1] denied Wersal’s motion and granted summary judgment in favor of the members of the Minnesota Board of Judicial Standards and the Minnesota Lawyers Professional Responsibility Board. On appeal, a divided panel of this court reversed, Wersal v. Sexton, 613 F.3d 821 (8th Cir.2010), concluding the clauses failed strict scrutiny. We granted the Appellee’s petition for en banc review, and we now affirm the district court’s decision upholding the constitutionality of the challenged clauses.
I
A. Wersal’s Previous Bids for a Seat on the Minnesota Supreme Court
Since its inception, Minnesota has utilized popular elections to select the judges of its courts. Minn. Const. art. 6, § 7. To *1014 govern these elections, the Minnesota Supreme Court promulgated certain restrictions contained in the Minnesota Code of Judicial Conduct (“Code”). Over the years, Gregory Wersal has challenged particular prohibitions of the Code in connection with his bids for various seats on the Minnesota Supreme Court, which has resulted in two cases lying at the genesis of the instant matter.
In 1996, Wersal ran for a seat as an associate justice. At the time, he sought the endorsement of the Republican Party of Minnesota, attended and spoke at party gatherings, and solicited campaign contributions. As a result of these activities, ethical complaints were filed with the Minnesota Lawyers Professional Responsibility Board, alleging Wersal had violated the Code by stating his views on disputed legal and political issues and seeking the endorsement of a political party. While the complaints were ultimately dismissed, Wersal withdrew as a candidate from the race.
In his second bid for a seat on the court in 1998, Wersal again spoke at political conventions and sought the Minnesota Republican Party’s endorsement. That year, Wersal sought an advisory opinion from the Minnesota Office of Lawyers Professional Responsibility, asking whether he would be subject to ethical violations for speaking at party gatherings, seeking the party’s endorsement, and announcing his views on disputed issues. Wersal, along with others, subsequently filed suit seeking to invalidate the relevant provisions of the Code as violative of his First Amendment rights. Although the district court and this court both upheld the validity of the challenged clauses, Republican Party of Minn. v. Kelly, 247 F.3d 854 (8th Cir.2001), the Supreme Court granted certiorari on the issue of whether the announce clause violated the First Amendment, and reversed. Republican Party of Minn. v. White, 536 U.S. 765, 122 S.Ct. 2528, 153 L.Ed.2d 694 (2002) (White I).
B. The Supreme Court’s Decision in White I
In White I, the Supreme Court considered the constitutionality of the announce clause, which stated a candidate for judicial office “shall not ‘announce his or her views on disputed legal or political issues.’” 536 U.S. at 768, 122 S.Ct. 2528 (quoting Minn.Code of Judicial Conduct, Canon 5(A)(3)(d)(i) (2000)). Because the clause was content-based, the Court examined it under strict scrutiny, asking whether the State met its burden to show the clause was “(1) narrowly tailored, to serve (2) a compelling state interest.” White I, 536 U.S. at 774-75, 122 S.Ct. 2528. The State offered two interests, both of which this court previously recognized as compelling: “preserving the impartiality of the state judiciary and preserving the appearance of the impartiality of the state judiciary.” Id. at 775, 122 S.Ct. 2528. In examining the asserted interests, the Court explored three potential definitions of “impartiality.” Id.
The first possible meaning of “impartiality,” identified by the Court as the word’s “root meaning,” is “the lack of bias for or against either party to the proceeding,” which “guarantees a party that the judge who hears his case will apply the law to him in the same way he applies it to any other party.” Id. at 775-76,122 S.Ct. 2528 (emphasis in original). The Court concluded the announce clause was not narrowly tailored to serve the asserted interests in this sense because “it does not restrict speech for or against particular parties, but rather speech for or against particular issues.” Id. at 776, 122 S.Ct. 2528 (emphasis in original).
The second meaning of “impartiality” recognized by the Court is a “lack of pre *1015 conception in favor of or against a particular legal view.” Id. at 777, 122 S.Ct. 2528 (emphasis in original). This uncommon use of the word could not be a compelling interest, the Court resolved, because a judge’s lack of predisposition on legal issues “has never been thought a necessary-component of equal justice[.]” Id. The Court further reasoned it would actually be undesirable to have judges who did not have preconceived views on legal issues, because this lack of introspection indicates a lack of qualification for the position. Id. at 778, 122 S.Ct. 2528.
Finally, the Court discussed a third possible meaning of “impartiality,” which it described as “open-mindedness,” whereby a judge remains willing to consider views contrary to his or her preconceptions and remain open to persuasion. Id. The Court found the announce clause unsupported by this asserted purpose:
In Minnesota, a candidate for judicial office may not say “I think it is constitutional for the legislature to prohibit same-sex marriages.” He may say the very same thing, however, up until the very day before he declares himself a candidate, and may say it repeatedly (until litigation is pending) after he is elected. As a means of pursuing the objective of open-mindedness that respondents now articulate, the announce clause is so woefully underinclusive as to render belief in that purpose a challenge to the credulous.
Id. at 779-80, 122 S.Ct. 2528. Thus, the Court concluded the announce clause was “woefully underinclusive, prohibiting announcements by judges (and would-be judges) only at certain times and in certain forms.” Id. at 783, 122 S.Ct. 2528. In sum, no matter how “impartiality” is defined, the Court held the announce clause was not narrowly tailored to the State’s asserted interests in maintaining the impartiality of the judiciary. Id. at 788, 122 S.Ct. 2528.
C. This Court’s Decision in White II
On remand from White I, after a divided panel of this court affirmed with regard to Wersal’s remaining challenges to the partisan-activities and solicitation clauses, Republican Party of Minn. v. White, 361 F.3d 1035 (8th Cir.2004), we granted en banc review and vacated the panel opinion. Ultimately, we sustained Wersal’s remaining challenges and concluded the partisan-activities and solicitation clauses violated the First Amendment. Republican Party of Minn. v. White, 416 F.3d 738 (8th Cir.2005) (en banc) (White II).
In White II, we first considered Wersal’s challenge to the partisan-activities clause, which stated “a judge or a candidate for election to judicial office shall not ... identify themselves as members of a political organization, except as necessary to vote in an election; ... attend political gatherings; or seek, accept or use endorsements from a political organization.” Id. at 745 (quoting 52 Minn. Stat. Ann., Code of Judicial Conduct, Canon 5, subd. A(1)(a), (d)). At the outset, we recognized Minnesota’s compelling interest in protecting litigants from biased judges. Id. at 754. However, closely tracking the reasoning of White I, we held the clause was not narrowly tailored to serve the State’s interest under this particular meaning of judicial impartiality. Id. We reasoned that association is itself an important form of speech and, to the extent association is a proxy for the expression of ideas and the alignment with particular views, “the clause is likewise ‘barely tailored’ to affect any interest in impartiality toward parties.” Id. Further, in the case of parties coming before a judge who associated with that party, we noted, “any credible claim of bias would have to flow from something more than the bare fact that the judge had *1016 associated with that political party,” because the associational restrictions are “part-and-parcel of a candidate’s speech for or against particular issues embraced by the political party.” Id at 755 (emphasis in original). Finally, if cases arose where the partisan activities raised more than an inference of bias, we concluded the problem could be solved through the less-restrictive means of recusal. Id
We also addressed the meaning of “impartiality” articulated by White I as “open-mindedness” in the context of the partisan-activities clause. Id at 756. Like the announce clause considered by the Supreme Court, we concluded the partisan-activities clause was “woefully underinclusive” because the clause was not adopted for the purpose of protecting judicial open-mindedness and the clause’s underinclusiveness betrayed the claim that it was compelling. Id On the latter point, we discussed how it made little sense for Minnesota to restrict associational activities to only political parties, while not restricting a judicial candidate’s association with varying political interest groups. Id at 759-60. In sum, we concluded the partisan activities clause was not narrowly tailored to any compelling state interest, and therefore violated the First Amendment. Id at 760.
We proceeded to consider the constitutionality of certain provisions of the solicitation clause, which barred candidates from “personally soliciting individuals or even large gatherings for campaign contributions.” Id at 768. The Code permitted a candidate to solicit donations through his campaign committee, and prohibited the candidate from learning the identity of any person to whom a solicitation was made. Id at 745. Wersal challenged two components of this system: first, he asserted a right to solicit contributions from large groups; second, he challenged a provision of the Code barring campaign committees from using the candidate’s signature on written solicitations. Id at 765.
We first recognized the prohibition on direct personal solicitation “certainly addresses a compelling state interest in impartiality as to parties to a particular case.” Id However, in striking down the challenged provisions, we determined the solicitation clause did not serve an interest in impartiality in the sense of preventing a lack of bias for or against a party to a case, because the Code specifically provided the contributions would be made to the candidate’s committee, and the candidate could not learn the identity of the donors. Id. In this sense, we reasoned the candidate would not be able to deduce who contributed to his or her campaign, and thus the blanket ban did not advance an interest in impartiality. Id. at 765-66. Accordingly, we concluded the challenged portions of the solicitation clause were “barely tailored” to the State’s interest in maintaining an impartial judiciary. Id at 765. We likewise concluded the solicitation clause “seems barely tailored to in any way affect the open-mindedness of a judge.” Id. at 766. Therefore, we held the solicitation clause violated the First Amendment. Id.
D. The Aftermath of White I and White II
In the wake of White I and White II, the Minnesota Supreme Court promulgated an amended version of the Code in 'response to the rulings. Specifically, the court eliminated the announce clause and revised the solicitation clause to allow candidates to solicit contributions if they spoke to an audience of 20 or more persons, and to allow campaign committees to use solicitation letters signed by the candidate.
In early 2007, Wersal announced his candidacy for Chief Justice of the Minnesota Supreme Court, running against then- *1017 Chief Justice Russell Anderson. As part of his campaign, Wersal wished to publicly endorse certain candidates for public office in 2008, including Tim Tinglestad, who ran against Justice Paul Anderson for the position of Associate Justice; Glen Jacobsen, a candidate for a judgeship in Minnesota District Court; and Michele Bachmann, a congresswoman from Minnesota’s Sixth District who ran for re-election. Wersal desired to publicly voice his support for the candidates through public statements, yard signs, phone calls, endorsement letters, and letters to potential contributors. However, he did not engage in any of these activities in fear of violating the Code. In addition, Wersal desired to personally solicit funds for his own campaign by going door-to-door and making personal phone calls. Again, Wersal refrained from engaging in this behavior for fear of violating the relevant ethical rules placed on judicial candidates.
On March 3, 2008, Wersal filed suit against every member of the Minnesota Board of Judicial Standards and Minnesota Lawyers Professional Responsibility Board in his or her official capacity (referred to collectively as “Minnesota”), challenging the constitutionality of Canons 5A(1)(b), 5A(1)(d), and 5B(2) (2008). On July 1, 2009, the Minnesota Supreme Court adopted a revised version of the Code. Canon 5A(1)(b) became Rule 4.1(A)(3); the new rule, which states a judge or judicial candidate shall not “publicly endorse or, except for the judge or candidate’s opponent, publicly oppose another candidate for public office,” is identical to the old rule. Former Canon 5A(1)(d) is now Rule 4.1(A)(4); the new rule, which provides a judge or judicial candidate shall not “solicit funds for a political organization or a candidate for pub-lie office, or make a contribution to a candidate for public office,” was changed slightly from the old rule. Finally, Canon 5B(2) has been divided into two new rules which do not differ in substance from the canon they replaced. Rule 4.1(A)(6) bars judges and judicial candidates from “personally solieit[ing] or accepting] campaign contributions other than as authorized by Rules 4.2 and 4.4.” Rule 4.2(B)(3)(a) permits a judge or judicial candidate to “make a general request for campaign contributions when speaking to an audience of 20 or more people.” In addition, Rule 4.2(B)(3)(c) permits a judge or judicial candidate to “personally solicit campaign contributions from members of the judge’s family, from a person with whom the judge has an intimate relationship, or from judges over whom the judge does not exercise supervisory or appellate authority.” However, no rule permits what Wersal seeks: to personally solicit campaign contributions by walking door-to-door and making phone calls.[2]
On March 10, 2008, then-Chief Justice Russell Anderson retired. Governor Tim Pawlenty appointed Eric Magnuson to replace Anderson on March 17, 2008. Due to the timing of the appointment, Chief Justice Magnuson was not required to face election until 2010. Although Wersal contemplated running against Associate Justice Paul Anderson, he ultimately refrained from running for any seat in 2008. At the time of the district court proceedings and initial appeal, Wersal stated he intended to run again for a seat on the Minnesota Supreme Court in 2010.[3]
Before the district court, Wersal and the defendants brought cross-motions for summary judgment, and the district court denied Wersal’s motion and granted the *1018 defendants’ motion. First, the district court concluded Wersal’s challenge to Rule 4.1(A)(4)(a), the solicitation for political organization or candidate clause, was not ripe. Next, the district court upheld the endorsement clause under strict scrutiny, concluding the clause was narrowly tailored to Minnesota’s interests in maintaining impartiality and maintaining the appearance of impartiality. Finally, the district court upheld the personal solicitation clause, holding the clause was narrowly tailored to meet Minnesota’s interest in maintaining judicial impartiality. In sum, the district court rejected all of Wersal’s challenges to the Code. On appeal, a divided panel of this court reversed the district court. We granted en banc review, and now proceed to consider the constitutionality of the challenged provisions.
II
We review a district court’s grant of summary judgment de novo, viewing the evidence in the light most favorable to the nonmoving party. Quinn v. St. Louis County, 653 F.3d 745, 750 (8th Cir.2011). Summary judgment is proper if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Rynders v. Williams, 650 F.3d 1188, 1194 (8th Cir.2011).
A. The Ripeness of Wersal’s Challenge to Rule 4.1(A)(4)(a)[4]
We first address the ripeness of Wersal’s challenge to Rule 4.1(A)(4)(a), which prohibits a judge or judicial candidate from “soliciting] funds for a political organization or a candidate for public office.” 52 Minn. Stat. Ann., Code of Judicial Conduct, Canon 4.1(A)(4)(a). “The ripeness doctrine is aimed at preventing federal courts, through premature adjudication, from ‘entangling themselves in abstract disagreements.’ ” Citizens for Equal Protection v. Bruning, 455 F.3d 859, 863 (8th Cir.2006) (quoting Thomas v. Union Carbide Agr. Prods. Co., 473 U.S. 568, 580, 105 S.Ct. 3325, 87 L.Ed.2d 409 (1985)). “Ripeness is demonstrated by a showing that a live controversy exists such that the plaintiffs will sustain immediate injury from the operation of the challenged [action], and that the injury would be redressed by the relief requested.” Employers Ass’n, Inc. v. United Steelworkers, 32 F.3d 1297, 1299 (8th Cir.1994).
Before the district court, Wersal argued Rule 4.1(A)(4)(a) prevented him from soliciting funds for his own campaign, which was a “political organization” within the meaning of the rule. The district court rejected Wersal’s interpretation, reasoning the rule only restricted the solicitation of funds for another candidate or another candidate’s political organization because a different set of rules—now Rules 4.1(a)(6), 4.2, and 4.4—govern solicitations for a judicial candidate’s own campaign. Therefore, the court concluded Wersal’s claim lacked ripeness because he was unable to show he faced a “credible threat of prosecution” for violating the clause.
After the district court’s decision, the Minnesota Supreme Court further clarified in an amendment, “[fjor purposes of this Code, the term [political organization] does not include a judicial candidate’s campaign committee created as authorized by Rule 4.4.” See Minn. Code of Judicial Conduct, Terminology, “Political organization” (2009). In an apparent recognition of the unsoundness of his “political organization” argument, Wersal now contends Rule 4.1(A)(4)’s ban on solicitation for “a candidate for public office” operates to prevent him from soliciting funds for his own campaign. We disagree.
*1019 As an initial matter, we agree with Wersal that he is a candidate for public office under the plain meaning of the phrase. However, our analysis does not end there. It is a basic tenet of construction that the Code must be construed as a whole so as to give effect to all provisions where possible, rather than rendering certain provisions null or superfluous. See TRW Inc. v. Andrews, 534 U.S. 19, 31, 122 S.Ct. 441, 151 L.Ed.2d 339 (2001) (“It is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.”) (internal quotation marks and citation omitted); see also Wintermute v. Kan. Bankers Sur. Co., 630 F.3d 1063, 1068 (8th Cir.2011) (“A basic tenet of contract law is that each word in the agreement should be interpreted to have a meaning, rather than to be redundant and superfluous.”) (internal quotation marks and citation omitted).
Employing this principle, we find illustrative Rule 4.4, which governs the establishment of a candidate’s campaign committee as a distinct entity from the candidate himself. Rule 4.4 “recognizes that judicial candidates must raise campaign funds to support their candidacies, and permits candidates ... to establish campaign committees to solicit and accept contributions.” 52 Minn. Stat. Ann., Code of Judicial Conduct, Canon 4.4, cmt. 1. The rule provides a buffer between the candidate and his campaign committee by instructing, for example, the candidate to direct his committee “not to disclose to the candidate the identity of campaign contributors[.]” 52 Minn. Stat. Ann., Code of Judicial Conduct, Canon 4.4(B)(3).
Rule 4.4 is expressly referenced in the personal solicitation clause, which prohibits a candidate from personally soliciting campaign contributions “other than as authorized by Rules 4.2 and 4.4.” 52 Minn. Stat. Ann., Code of Judicial Conduct, Canon 4.1(A)(6). When reading these provisions together, it becomes clear Wersal is not barred from soliciting funds for his campaign committee, which is all he seeks to do for purposes of this clause. Notably, Wersal does not challenge the provisions of the Code relating to campaign committees. Under Wersal’s reading of Rule 4.1(A)(4)(a), such provisions would be rendered superfluous, as recognized by the district court. Given our reading of Rule 4.1(A)(4)(a), Wersal’s challenge is not ripe because he only seeks to solicit funds for his own campaign committee — which he is permitted to do under the Code — and not for another’s campaign, or himself personally, and therefore he cannot show there is a likelihood he would face sanctions for engaging in his desired conduct. Thus, we affirm the district court’s dismissal of this claim.
B. Wersal’s First Amendment Challenges
After concluding Wersal’s challenge to Rule 4.1(A)(4) is not ripe, we proceed to consider his facial and as-applied constitutional challenges to the endorsement clause and the revised solicitation clause. Under the First Amendment, made applicable to the states, see McIntyre v. Ohio Elections Comm’n, 514 U.S. 334, 336 n. 1, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995), “Congress shall make no law ... abridging the freedom of speech.” U.S. Const. amend. I. Because the challenged clauses are content-based restrictions on political speech, we examine Wersal’s challenges under strict scrutiny. White I, 536 U.S. at 774, 122 S.Ct. 2528; see also Carey v. Wolnitzek, 614 F.3d 189, 198-200 (6th Cir.2010) (applying strict scrutiny to a solicitation clause). But see Siefert v. Alexander, 608 F.3d 974, 983 (7th Cir.2010) (applying a balancing test, rather than strict scruti *1020 ny, to evaluate an endorsement clause).[5] Under strict scrutiny, Minnesota bears the burden of proving the endorsement and solicitation clauses (1) advance a compelling state interest and (2) are narrowly tailored to serve that interest. White I, 536 U.S. at 774-75, 122 S.Ct. 2528. We will consider each of these inquiries in turn.
1. Compelling State Interest
As we recognized in White II, it is difficult to derive a precise definition of what constitutes a “compelling interest.” 416 F.3d at 750. “In general, strict scrutiny is best described as an ends-and-means test that asks whether the state’s purported interest is important enough to justify the restriction it has placed on the speech in question in pursuit of that interest.” Id.
Minnesota asserts several compelling interests, including (1) maintaining judicial impartiality, defined as the lack of bias for or against either party to a proceeding; (2) maintaining the appearance of judicial impartiality; (3) promoting open-mindedness; (4) preventing candidates from abusing the prestige of judicial office; and (5) protecting the political independence of the judiciary. The first three of these asserted interests recall to mind the definitions of impartiality set forth by Justice Scalia in White I, which were expounded upon by our decision in White II. See supra Part I.B.
In harmony with White I and White II, we have little difficulty concluding Minnesota’s interest in preserving impartiality, defined as the lack of bias for or against a party to a proceeding, is compelling. See Siefert, 608 F.3d at 981 (“Insofar as impartiality refers to ‘the lack of bias for or against either party to the proceeding,’ it is a compelling state interest.”) (quoting White I, 536 U.S. at 775, 122 S.Ct. 2528) (emphasis in original). “It is axiomatic that a fair trial in a fair tribunal is a basic requirement of due process.” Caperton v. A.T. Massey Coal Co., 556 U.S. 868, 129 S.Ct. 2252, 2259, 173 L.Ed.2d 1208 (2009) (internal quotation marks and citation omitted); see also Johnson v. Mississippi, 403 U.S. 212, 216, 91 S.Ct. 1778, 29 L.Ed.2d 423 (1971) (per curiam) (“Trial before ‘an unbiased judge’ is essential to due process.”) (quoting Bloom v. Illinois, 391 U.S. 194, 205, 88 S.Ct. 1477, 20 L.Ed.2d 522 (1968)). Indeed, in White II, we expressly recognized this meaning of impartiality constitutes a compelling state interest:
It can hardly be argued that seeking to uphold a constitutional protection, such as due process, is not per se a compelling state interest. And the rule laid down in [Tumey v. Ohio, 273 U.S. 510, 523, 47 S.Ct. 437, 71 L.Ed. 749 (1927) ] makes clear that the partiality of a judge as it relates to a party to a case violates due process protections: “It certainly violates the Fourteenth Amendment, and deprives a person of due process of law, to subject his liberty or property to the judgment of a court the judge of which has a direct, personal, substantial, pecuniary interest in reaching a conclusion against him in his case.” In [Bracy v. Gramley, 520 U.S. 899, 904-05, 117 S.Ct. 1793, 138 L.Ed.2d 97 (1997) ], the Court reiterated that “the floor established by the Due Process Clause clearly requires a fair trial in a fair tribunal, before a judge with no *1021 actual bias against the defendant or interest in the outcome of his particular case.”
416 F.3d at 753 (internal citation omitted).
However, much in the same way White I “implied ... this meaning of impartiality describes a state interest that is compelling,” id. (emphasis in original), White I and White II both implied preserving the appearance of impartiality constitutes a compelling interest, separate and distinct from the state interest in preventing actual bias. See White I, 536 U.S. at 776, 122 5. Ct. 2528 (analyzing the tailoring of the announce clause to the state’s interest in impartiality “or the appearance of impartiality”); White II, 416 F.3d at 755, 758-59 (discussing the tailoring of the partisan-activities clause as it related to Minnesota’s interest in the appearance of impartiality).[6] Nonetheless, we find it necessary to discuss the appearance of impartiality in some depth, given the interest has garnered far too little attention in White I and White II.
Similar to the definition of impartiality provided in White I as “the lack of bias for or against either party to the proceeding,” 536 U.S. at 775, 122 S.Ct. 2528, the appearance of impartiality may be defined as the perception the public maintains regarding the judiciary’s lack of bias for or against *1022 either party to a proceeding. See Caperton, 129 S.Ct. at 2266 (“The ABA Model Code’s test for appearance of impropriety is “whether the conduct would create in reasonable minds a perception that the judge’s ability to carry out judicial responsibilities with integrity, impartiality and competence is impaired.’ ”) (quoting ABA Annotated Model Code of Judicial Conduct, Canon 2A, Commentary).[7] As this definition suggests, there is a significant relation between actual and perceived impartiality, although the two concepts are unique. For instance, a judge who harbors a bias against a particular group, but shows no outward manifestations of the bias lacks impartiality, even though there is no appearance of bias. At the same time, a judge who uses disrespectful language to one party may be perceived as lacking impartiality, even if that judge in fact harbors no actual bias against the party.
These examples highlight some important differences between the two concepts. First, actual impartiality concerns the mental state of a particular judge, whereas the appearance of impartiality arises from the public’s perception of that judge. Second, the appearance of impartiality often stems from the collective awareness of the public, and thus Minnesota’s interest in maintaining the appearance of impartiality is in this sense broader and qualitatively different than its interest in fostering actual impartiality. See Buckley v. Valeo, 424 U.S. 1, 27, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (discussing the appearance of corruption, which “stem[s] from public awareness of the opportunities for abuse inherent in a regime of large individual financial contributions.”). Instead of aiming to protect the due process rights of actual parties to a case, maintaining the appearance of impartiality is systemic in nature, as it is essential to protect the judiciary’s reputation for fairness in the eyes of all citizens. This reputational interest is not a fanciful one; rather, public confidence in the judiciary is integral to preserving our justice system. See Mistretta v. United States, 488 U.S. 361, 407, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989) (“The legitimacy of the Judicial Branch ultimately depends on its reputation for impartiality and nonpartisanship.”); In re Murchison, 349 U.S. 133, 136, 75 S.Ct. 623, 99 L.Ed. 942 (1955) (“[T]o perform its high function in the best way ‘justice must satisfy the appearance of justice.’ ”) (quoting Offutt v. United States, 348 U.S. 11, 14, 75 S.Ct. 11, 99 L.Ed. 11 (1954)); Bauer v. Shepard, 620 F.3d 704, 712 (7th Cir.2010) (“The judicial system depends on its reputation for impartiality; it is public acceptance, rather than the sword or the purse, that leads decisions to be obeyed and averts vigilantism and civil strife.”).[8] As Justice Kennedy stated in White I:
*1023 Here, Minnesota has sought to justify its speech restriction as one necessary to maintain the integrity of its judiciary. Nothing in the Court’s opinion should be read to east doubt on the vital importance of this state interest. Courts, in our system, elaborate principles of law in the course of resolving disputes. The power and the prerogative of a court to perform this function rest, in the end, upon the respect accorded to its judgments. The citizen’s respect for judgments depends in turn upon the issuing court’s absolute probity. Judicial integrity is, in consequence, a state interest of the highest order.
536 U.S. at 793, 122 S.Ct. 2528; see also Jed Handelsman Shugerman, In Defense of Appearances: What Caperton v. Massey Should Have Said, 59 DePaul L. Rev. 529, 541 (2010) (“As Balzac once wrote, ‘To distrust the judiciary marks the beginning of the end of society.’ ”) (citation omitted).
Lest there be any doubt about Minnesota’s conviction in the importance of preserving the appearance of impartiality, the Minnesota Supreme Court fortified these principles directly into the Code:
An independent, fair, and impartial judiciary is indispensable to our system of justice. The United States legal system is based upon the principle that an independent, impartial, and competent judiciary, composed of men and women of integrity, will interpret and apply the law that governs our society. Thus, the judiciary plays a central role in preserving the principles of justice and the rule of law. Inherent in all the Rules contained in this Code are the precepts that judges, individually and collectively, must respect and honor the judicial office as a public trust and strive to maintain and enhance confidence in the legal system.
52 Minn. Stat. Ann., Code of Judicial Conduct, Preamble. The Code proceeds to guide judges to “maintain the dignity of judicial office at all times, and avoid both impropriety and the appearance of impropriety in their professional and personal lives,” as well as to “aspire at all times to conduct that ensures the greatest possible public confidence in their independence, impartiality, integrity, and competence.” Id.; see also Caperton, 129 S.Ct. at 2266 (“Almost every State ... has adopted the American Bar Association’s objective standard: ‘A judge shall avoid impropriety and the appearance of impropriety.’ ”) (quoting ABA Annotated Model Code of Judicial Conduct, Canon 2 (2004)).
In light of the foregoing, we easily conclude Minnesota’s interest in preserving the appearance of impartiality is compelling, particularly when cast against *1024 other interests courts have recognized as compelling. See Stephen E. Gottlieb, Compelling Governmental Interests: An Essential But Unanalyzed Term in Constitutional Adjudication, 68 B.U. L. Rev. 917, 935 n. 85 (1988) (collecting cases recognizing various compelling interests). In sum, we conclude Minnesota has met its burden of demonstrating a compelling state interest in (1) maintaining judicial impartiality and (2) maintaining the appearance of judicial impartiality.[9] See Siefert, 608 F.3d at 985 (“Due process requires both fairness and the appearance of fairness in the tribunal.”).
2. Narrowly Tailored
Having concluded Minnesota has established the above compelling interests, we proceed to consider whether the challenged provisions of the Code are narrowly tailored to serve those interests. In doing so, we must examine the relatedness between the regulation and the asserted interests:
A narrowly tailored regulation is one that actually advances the state’s interest (is necessary), does not sweep too broadly (is not overinclusive), does not leave significant influences bearing on the interest unregulated (is not underinclusive), and could be replaced by no other regulation that could advance the interest as well with less infringement of speech (is the least-restrictive alternative).
White II, 416 F.3d at 751.
a. Endorsement Clause
We first address the endorsement clause, which states a judge or a judicial candidate shall not “publicly endorse or, except for the judge or candidate’s opponent, publicly oppose another candidate for public office.” 52 Minn. Stat. Ann., Code of Judicial Conduct, Canon 4.1(A)(3). Wersal contends this prohibition does not serve to limit actual bias regarding parties, because while there is a slight risk a judge will become biased in the event he or she receives an endorsement, the same is not true when the judge or candidate makes an endorsement. Moreover, Wersal argues even if the judge or candidate is biased in favor of the candidate he or she endorses, the endorsement is not the cause of the bias, but mere evidence of its previous existence. Thus, Wersal asserts the justification for the endorsement clause must turn on the appearance of bias created by the endorsement, but he claims such concerns are best dealt with via recusal.
For support, Wersal relies on our decision in White II, where we stated, “[i]n one sense, the underlying rationale for the partisan-activities clause — that associating with a particular group will destroy a judge’s impartiality — differs only in form from that which purportedly supports the announce clause — that expressing one’s self on particular issues will destroy a judge’s impartiality.” 416 F.3d at 754 (emphasis omitted). Recognizing the protection afforded to the right of association, we concluded the partisan-activities clause was “barely tailored” to any interest in impartiality toward parties to the extent it sought “to keep judges from aligning with particular views on issues by keeping them from aligning with a particular political party.” Id. According to Wersal, this reasoning may be extended to the endorsement clause, because a candidate’s association with another candidate by way of an endorsement is no more a threat to impartiality than a candidate associating with a political party or political interest *1025 group. Similarly, in this sense, Wersal contends the endorsement clause is over-broad because Minnesota has no interest in preventing judges or candidates from associating themselves with like-minded individuals and groups.
Like the district court, we conclude the endorsement clause serves the compelling interests of preserving impartiality and avoiding the appearance of impropriety. At the outset, we must refuse Wersal’s attempt to liken the endorsement clause to the partisan-activities clause in White II. In White I, the Supreme Court concluded the announce clause was “barely tailored” because “it does not restrict speech for or against particular parties, but rather speech for or against particular issues.” 536 U.S. at 776, 122 S.Ct. 2528 (emphasis in original). While White II concluded the partisan-activities clause was, in one sense, merely an extension of the announce clause in White I, see White II, 416 F.3d at 754-55, the same is not true here because the endorsement clause is plainly a restriction of speech for or against particular parties, rather than for or against particular issues. See Yost v. Stout, No. 06-4122-JAR, slip op. at 12 (D.Kan. Nov. 16, 2008) (upholding a clause “restrictpng] a judge or judicial candidate from publicly endorsing other candidates for public office [because] it does not restrict speech concerning disputed political issues.”). When a judge or judicial candidate endorses another candidate, it creates a risk of partiality toward the endorsed party and his or her supporters, as well as a risk of partiality against other candidates opposing the endorsed party. The endorsement clause is directly aimed at this speech about parties, as it prevents potential litigants in a case from the risk of having an unfair trial. At the very least, the clause serves the State’s interest in avoiding the appearance of impropriety. Namely, even if a particular endorsement does not serve to create an actual bias toward or against a particular party, the act of endorsement itself undermines the judiciary’s appearance of impartiality because the public may perceive the judge to be beholden to political interests.
Our conclusion is bolstered by the Seventh Circuit’s recent decision in Siefert, where the court rejected a judge’s attempt to analogize an endorsement clause with a partisan-activities clause:
While an interest in the impartiality and perceived impartiality of the judiciary does not justify forbidding judges from identifying as members of political parties, a public endorsement is not the same type of campaign speech targeted by the impermissible rule against party affiliation in this case or the impermissible rule against talking about legal issues the Supreme Court struck down in White I. As Judge Siefert notes, “endorsements primarily benefit the endorsee, not the endorser” and endorsements may be exchanged between political actors on a quid pro quo basis. This amounts to a concession that offering an endorsement is less a judge’s communication about his qualifications and beliefs than an effort to affect a separate political campaign, or even more problematically, assume a role as political powerbroker.
When judges are speaking as judges, and trading on the prestige of their office to advance other political ends, a state has an obligation to regulate their behavior. We thus see a dividing line between the party affiliation rule, which impermissibly bars protected speech about the judge’s own campaign, and the public endorsement rule, which addresses a judge’s entry into the political arena on behalf of his partisan comrades.
608 F.3d at 984 (citation omitted). Although the court expressed these concerns en route to applying a balancing approach, *1026 instead of strict scrutiny, we find them equally valid under the strict scrutiny approach. Under either framework, a judge “who tips the outcome of a close election in a politician’s favor would necessarily be a powerful political actor, and thus call into question the impartiality of the court.” Id. at 986.
Of course, unlike Siefert, which did not apply strict scrutiny, “[t]he question under our strict scrutiny test ... is not whether the [endorsement] clause serves this interest at all, but whether it is narrowly tailored to serve this interest.” White I, 586 U.S. at 777 n. 7, 122 S.Ct. 2528 (emphasis in original). With this in mind, we must address whether the endorsement clause is overinclusive, underinclusive, or whether there is a less restrictive means of accomplishing the State’s interests.
We first conclude the endorsement clause is not overinclusive because it does not sweep too broadly. As noted above, unlike the announce clause struck down in White I, the endorsement clause restricts speech for or against particular parties. Although there is some merit in Wersal’s argument that an endorsement would serve as a proxy for other underlying ideas, taken to its logical conclusion, such an approach would eviscerate the entire party-issue dichotomy set forth in White I. Under this reasoning, even direct statements of bias toward or against a party could be said to serve as a proxy for underlying issues, even though such statements would undeniably violate a party’s due process guarantees. See id. at 775-76, 122 S.Ct. 2528 (discussing the traditional meaning of impartiality).
Instead, we abide by White I’s directive to analyze whether the clause “restricts] speech for or against particular parties, ... [or] for or against particular issues.” Id. at 776, 122 S.Ct. 2528 (emphasis in original). This approach accords with the Supreme Court’s jurisprudence, which analyzes content-based restrictions under strict scrutiny by reference to the content itself. See, e.g., Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd., 502 U.S. 105, 121-23, 112 S.Ct. 501, 116 L.Ed.2d 476 (1991) (discussing the overinclusiveness of a law preventing criminals from profiting by selling books describing their crimes). Here, the endorsement clause does not regulate speech with regard to any underlying issues, and thus the candidates are free to state their positions on these issues, in line with White I.[10] Moreover, candidates are not prevented from conveying necessary information concerning their qualifications to the electorate. See Eu v. San Francisco Cnty. Democratic Cent. Comm., 489 U.S. 214, 223, 109 S.Ct. 1013, 103 L.Ed.2d 271 (1989) (“We have recognized repeatedly that debate on the qualifications of candidates is integral to the operation of the system of government established by our Constitution.”) (internal quotations and citation omitted). Instead, the clause only prohibits the act of endorsement itself, which, as noted above, is a direct expression of bias in favor of or against potential parties to a case, or at the very least, damages the appearance of impartiality. Therefore, the clause targets precisely that speech which most likely implicates Minnesota’s compelling interests.
*1027 We also conclude the endorsement clause is not underinclusive, despite the fact it only applies to endorsements for other “candidate[s] for public office.” In response to the charge that a judicial candidate may endorse another public official so long as the official has not yet filed for office, we find instructive another provision of the Code providing, “a judge or judicial candidate shall not ... make any statement that would reasonably be expected to affect the outcome or impair the fairness of a matter pending or impending in any court....” 52 Minn. Stat. Ann., Code of Judicial Conduct, Canon 4.1(A)(10). Reading the endorsement clause in conjunction with Rule 4.1(A)(10), a judicial candidate would patently be prevented from making biased statements for or against a party or an impending party, regardless of whether the public official had officially become a “candidate” at the time of the statement.
Nor is this a situation like the Seventh Circuit confronted in Siefert, where an endorsement clause only applied to endorsements in partisan elections. 608 F.3d at 987. Siefert recognized “this underinclusiveness could be fatal to the rule’s constitutionality” under strict scrutiny. Id. By contrast, Minnesota’s endorsement clause pertains to endorsements of any candidate for public office, regardless of whether the elections are partisan or nonpartisan, and thus the concerns articulated in Siefert do not bear fruit here.
Finally, we must address whether recusal would pose a less restrictive alternative to address Minnesota’s compelling interests. In White II, we discussed recusal in the context of the partisan-activities clause, including the specific situation of “political cases where a judge is more personally involved,” such as redistricting cases where a judge’s district is at issue. 416 F.3d at 755. In these situations, we concluded “recusal is the least restrictive means of accomplishing the state’s interest in impartiality articulated as a lack of bias for or against parties to the case.” Id.
The present case presents a far different set of circumstances than those we contemplated in White II. To begin, our redistricting hypothetical in White II originated with our recognition that:
[I]n a case where a political party comes before a judge who has substantially associated himself or herself with that same party, a question could conceivably arise about the potential for bias in favor of that litigant. Yet even then, any credible claim of bias would have to flow from something more than the bare fact that the judge had associated with that political party. That is because the associational activities restricted by Canon 5 are, as we have pointed out, part-and-parcel of a candidate’s speech for or against particular issues embraced by the political party. And such restrictions, we have also said, do not serve the due process rights of parties.
Id. (emphasis in original). Here, as discussed in depth above, an endorsement itself would be enough to create bias or the appearance of bias, because it is speech directly in favor of or against parties, rather than speech regarding particular issues.
Second, our hypothetical in White II envisioned cases where recusals would be infrequent and relatively unburdensome, such that a blanket ban on the judge’s conduct would be akin to “‘burning the house to roast the pig.’ ” Id. (quoting Butler v. Michigan, 352 U.S. 380, 383, 77 S.Ct. 524, 1 L.Ed.2d 412 (1957)). Under Wersal’s sought-after system of open endorsements, however, recusal would be an unworkable remedy because candidates and judges would be free to endorse individuals who would become frequent litigants in future cases, such as county sheriffs and *1028 prosecutors. See Siefert, 608 F.3d at 987 (discussing the difficulty of recusal “where a judge endorses a prosecutor or sheriff who frequently appears in front of the court”). Or, in the case of one of Wersal’s proposed endorsements, the individual could become a district court judge subject to appellate review by the endorsing Supreme Court judge. Under either circumstance, this has the potential to create “an insurmountable burden for the court system.” Wersal, 607 F.Supp.2d at 1023; see also Br. of Former Governor & Chief Justices as Amici Curiae 4 (“Recusal is a blunt instrument, wielded differently by individual judges and in particular circumstances; and recusal motions are not infrequently only gamesmanship seeking delay.”).
Moreover, even if the judiciary would not be plagued by these conflicts and inefficiencies, as Wersal suggests, we find little comfort in recusal as a less restrictive means of addressing Minnesota’s separate interest in avoiding the appearance of impropriety. See Caperbon, 129 S.Ct. at 2266 (recognizing the impact recusals have on the public’s impression of the judiciary); Mistretta, 488 U.S. at 407, 109 S.Ct. 647 (“While the problem of individual bias is usually cured through recusal, no such mechanism can overcome the appearance of institutional partiality that may arise from judiciary involvement in the making of policy.”).
In sum, we conclude Minnesota’s endorsement clause is narrowly tailored to serve its compelling interests of preserving impartiality and preserving the appearance of impartiality. See In re Matter of William A Vincent, 143 N.M. 56, 172 P.3d 605, 606, 609 (2007) (concluding a clause prohibiting candidates or judges from “publicly endors[ing] or publicly opposing] a candidate for public office through the news media or in campaign literature” was “narrowly tailored to serve the State’s compelling interest in a judiciary that is both impartial in fact and in appearance”) (internal quotation marks and citation omitted); In re Matter of Ira J. Raab, 100 N.Y.2d 305, 763 N.Y.S.2d 213, 793 N.E.2d 1287, 1292 (2003).
b. Solicitation Clause
We next address the solicitation clause, which bars judges and candidates from “personally soliciting] or accepting] campaign contributions other than as authorized by Rules 4.2 and 4.4.” 52 Minn. Stat. Ann., Code of Judicial Conduct, Canon 4.1(A)(6). As noted above, Rules 4.2 and 4.4 allow candidates to solicit funds through a campaign committee, although the committee is not to disclose the identity of contributors to the candidate. Id. at Canon 4.2(B)(1) & 4.4(B)(3). Moreover, Rule 4.2 permits a candidate to “make a general request for campaign contributions when speaking to an audience of 20 or more people,” and to “personally solicit campaign contributions from members of the judge’s family, from a person with whom the judge has an intimate relationship, or from judges over whom the judge does not exercise supervisory or appellate authority.” Id. at Canon 4.2(B)(3)(a) & (B)(3)(c).
Wersal contends the solicitation clause is not narrowly tailored to further Minnesota’s interests in impartiality because it is not the solicitation, but the receipt of contributions that poses a risk to impartiality. Because the clause is not concerned with contributions, but with solicitation, Wersal argues it is “barely tailored” to Minnesota’s interests in impartiality. Moreover, Wersal asserts information about who contributed to a judge’s campaign is readily available via the Internet, and thus a ban on personal solicitation fails to further Minnesota’s interests. To the extent the clause serves an interest in avoiding the *1029 appearance of impropriety, Wersal argues recusal is once again a less restrictive alternative. Finally, Wersal challenges Minnesota’s decision to permit solicitations to groups of 20 or more people, which he claims demonstrates either underinclusiveness or overinclusiveness.
In considering Minnesota’s old solicitation clause in White II, we began our analysis by recognizing, “[k]eeping candidates, who may be elected judges, from directly soliciting money from individuals who may come before them certainly addresses a compelling state interest in impartiality as to parties to a particular case.” 416 F.3d at 765. However, we determined it was unlikely a judicial candidate would be biased in favor of or against a litigant based on a contribution to the candidate’s campaign, because the Code provided such contributions would be made to the candidate’s committee, and the committee was barred from disclosing those who did or did not contribute to the committee. Id. Accordingly, we concluded the contested portions of the solicitation clause — those dealing with a candidate’s signature or solicitations to large groups— were “barely tailored” to Minnesota’s interests in impartiality due to the candidate’s inability to decipher the source of funds in response to a solicitation in either circumstance. Id. at 765-66.
As the district court correctly observed, our conclusion in White II was largely predicated on the distinction between the large group solicitation and signature bans challenged in White II, and personal solicitation, which is challenged in the present case.[11] Namely, unlike the challenged portions in White II, direct personal solieitation creates a situation where potential contributors must choose to either contribute to the candidate, or decline to contribute, with a resulting risk of retribution. See In re Dunleavy, 838 A.2d 338, 351 (Me.2003) (“If a contribution is made, a judge might subsequently be accused of favoring the contributor in court. If a contribution is declined, a judge might be accused of punishing a contributor in court.”). In either scenario, the candidate is more likely to decipher whether the potential donor chooses to make a contribution, which gives rise to a greater risk of a quid pro quo. See Br. of Former Governor & Chief Justices as Amici Curiae 3 (“[T]here is no way to have meaningful campaign solicitations where a candidate can freely solicit contributions in one-on-one meetings with prospective donors without a substantial likelihood of learning, at least in many instances, the outcome of the ‘ask.’ ”).
In Siefert, the Seventh Circuit similarly recognized the cumulative effect of the scenario posed above:
A contribution given directly to a judge, in response to a judge’s personal solicitation of that contribution, carries with it both a greater potential for a quid pro quo and a greater appearance of a quid pro quo than a contribution given to the judge’s campaign committee at the request of someone other than the judge, or in response to a mass mailing sent above the judge’s signature.
608 F.3d at 989. Specifically, “[a] direct solicitation closely links the quid — avoiding the judge’s future disfavor — to the quo— the contribution.” Id.
*1030 We must emphasize once more Minnesota’s separate interest in avoiding the appearance of impropriety. Regardless of whether a potential donor chooses to make a contribution — and whether a candidate ultimately learns of the donor’s choice— the appearance of impartiality is attenuated. See id. at 989-90 (‘We do not mean to suggest that judges who directly solicit contributions are necessarily behaving inappropriately, but the appearance of and potential for impropriety is significantly greater when judges directly solicit contributions than when they raise money by other means.”). “Even if judges were able to refrain from favoring donors, the mere possibility that judges’ decisions may be motivated by the desire to repay campaign contributions is likely to undermine the public’s confidence in the judiciary.” White I, 536 U.S. at 790, 122 S.Ct. 2528 (O’Connor, J., concurring). Therefore, “ ‘[iJnsulating the judge from such direct solicitation eliminates the appearance (at least) of impropriety and, to that extent, preserves the judiciary’s reputation for integrity.’ ” Stretton v. Disciplinary Bd. of Supreme Court of Penn., 944 F.2d 137, 145 (3d Cir.1991) (quoting In re Fadeley, 310 Or. 548, 802 P.2d 31, 40 (1990)).
Additionally, as we highlighted in White 11, unlike the judicial codes in some states, Minnesota’s Code “prevents a candidate from knowing the identity of contributors or even non-contributors[.]” 416 F.3d at 766. This feature serves to distinguish this case from others where the candidate was permitted to learn the identity of the contributors, and thus Wersal’s argument finds little support by relying on these cases. See, e.g., Carey, 614 F.3d at 205 (“The clause ... does not bar the candidate from learning how individuals responded to the committee’s solicitations. That omission suggests that the only interest at play is the impolitic interpersonal dynamics of a candidate’s request for money, not the more corrosive reality of who gives and how much.”); Weaver v. Bonner, 309 F.3d 1312, 1322-23 (11th Cir.2002) (“Successful candidates will feel beholden to the people who helped them get elected regardless of who did the soliciting of support.”).[12] We find Wersal’s counterargument that candidates may learn the identity of donors through the Internet unavailing. As Minnesota points out, this is true regarding a number of provisions of the Code. For instance, a judge could independently investigate the facts of a case through the Internet, despite the Code’s prohibition against this activity. See 52 Minn. Stat. Ann., Code of Judicial Conduct, Canon 2.9(C) (“A judge shall not investigate facts in a matter independently, and shall consider only the evidence presented and any facts that may properly be judicially noticed.”). Simply because a judge or candidate may decide to violate *1031 the Code’s proscriptions is not a testament to their unconstitutionality.
For the foregoing reasons, the “ask” is precisely the speech Minnesota must regulate to maintain its interest in impartiality and the appearance of impartiality. See Siefert, 608 F.3d at 990 (“[T]he personal solicitation itself presents the greatest danger to impartiality and its appearance.”); see also Bauer, 620 F.3d at 710 (upholding the constitutionality of a personal solicitation clause due to the “potential for actual or perceived mutual back scratching”).
We turn last to Wersal’s renewed suggestion that recusal is a less restrictive means of preventing bias. Although we did not address recusal in White II in the context of solicitation, we are persuaded by the Seventh Circuit’s analysis on the issue. In Siefert, the court concluded there was no less restrictive means available, because of the fact “that judicial campaigns are often largely funded by lawyers, many of whom will appear before the candidate who wins,” and thus “[i]t would be unworkable for judges to recuse themselves in every case that involved a lawyer whom they had previously solicited for a contribution.” 608 F.3d at 990.
We are also mindful of the recent Supreme Court decision in Caperton, where the Court held the Due Process Clause required a judge to recuse himself in an appeal involving a corporation whose chief executive officer spent over $2.5 million in support of the judge during his election, “whether or not actual bias exist[ed] or [could] be proved.” 129 S.Ct. at 2257-58, 2265. Although the Court stressed the “extreme” nature of the facts leading to the recusal, we find Caperton illustrative of the unworkability of recusal in the present case. Namely, recusal serves as an after-the-fact remedy that is insufficient to cure the damage to the appearance of impartiality fashioned by personal solicitation, which is by and large complete at the time of the “ask.” At the very least, by the time the Due Process Clause requires recusal of a judge, the appearance of impartiality has already been impaired.
In sum, we conclude recusal would not be a workable remedy to prevent bias or, in particular, the appearance of bias stemming from personal solicitations. We therefore hold the solicitation clause is narrowly tailored to serve Minnesota’s interests in preserving impartiality and preserving the appearance of impartiality.
Ill
“As Justice O’Connor noted in her White concurrence, ‘the very practice of electing judges undermines an interest’ in an actual and perceived impartial judiciary.” White II, 416 F.3d at 747 (quoting White I, 536 U.S. at 788, 122 S.Ct. 2528 (O’Connor, J., concurring)). Nonetheless, in White II, we explicitly stated we did “not ‘doom,’ by setting the bar too high, all future attempts by Minnesota to adopt judicial election regulations that will pass strict scrutiny.” Id. at 763 n. 14. This case presents such constitutionally permissible regulations we opined of in White II. For the foregoing reasons, we affirm the district court’s decision upholding the constitutionality of the challenged provisions.

. The Honorable Ann D. Montgomery, United States District Judge for the District of Minnesota.

. We refer to the current version of the rules in the remainder of this opinion.

. Wersal did in fact ran against Associate Justice Helen Meyer for a seat in 2010, but he was unsuccessful in his bid.

. Judge Colloton, Judge Gruender, and Judge Benton join only Part II.A. of this opinion.

. Minnesota does not argue we should apply anything less than strict scrutiny, even after Siefert was decided. See Response to Appellant’s Supplemental Authority ("Under the reasoning in Siefert, Minnesota’s endorsement clause would pass strict scrutiny."). Even if it had made this argument, we would not need to reach the issue, because we ultimately conclude the endorsement clause passes constitutional muster under the tougher strict scrutiny test.

. Judge Beam's claim that we "seek[] to create from scratch” the interest in preserving the appearance of impartiality is perplexing, post at 1044, given that this court previously concluded the interest was compelling. See Kelly, 247 F.3d at 867 (“The governmental interest in an independent and impartial judiciary is matched by its equally important interest in preserving public confidence in that independence and impartiality.”). White I expressly acknowledged this point: “The Court of Appeals concluded that respondents had established two interests as sufficiently compelling to justify the announce clause: preserving the impartiality of the state judiciary and preserving the appearance of the impartiality of the state judiciary.” 536 U.S. at 775, 122 S.Ct. 2528 (emphasis added). From there, White I proceeded to analyze the vague concept of "impartiality,” which was a common term to both asserted interests. Id. at 775-78, 122 S.Ct. 2528. In assessing the first meaning of the term, "the lack of bias for or against either party to the proceeding,” the Court held "the announce clause is not narrowly tailored to serve impartialily (or the appearance of impartiality) in this sense.” Id. at 775-76, 122 S.Ct. 2528. Importantly, the Court reached its conclusion under the narrow tailoring prong of the strict scrutiny analysis, instead of deciding the asserted interests were not compelling under the first prong. See White II, 416 F.3d at 754 ("In White [I], the Supreme Court found the announce clause failed the narrow tailoring aspect of the strict scrutiny test[.]”). This explains why we concluded in White II that the Supreme Court implied the first meaning of "impartiality” described a compelling interest — a conclusion with which Judge Beam apparently agrees with regard to actual bias. White II, 416 F.3d at 753.
Having agreed White I implied a compelling interest with respect to impartiality, Judge Beam fails to explain how White I simultaneously rejected any implication with regard to preserving the appearance of impartiality, particularly because the language quoted by Judge Beam supposedly in favor of his argument speaks of both interests. See White I, 536 U.S. at 776, 122 S.Ct. 2528 ("[T]he announce clause is not narrowly tailored to serve impartiality (or the appearance of impartiality) in this sense.”) (emphasis added). Nor does Judge Beam explain why this court in White II proceeded to analyze the tailoring of the partisan-activities clause with respect to preserving the appearance of impartiality if there was not "even a hint” the interest was compelling. See White II, 416 F.3d at 755 ("Through recusal, the same concerns of bias or the appearance of bias that Minnesota seeks to alleviate through the partisan-activities clause are thoroughly addressed without burning the house to roast the pig.”) (internal quotation marks and citation omitted) (emphasis added). Finally, as a more fundamental matter, Judge Beam fails to illustrate how due process does not encompass concerns over the appearance of impartiality. See Siefert, 608 F.3d at 985 (“Due process requires both fairness and the appearance of fairness in the tribunal.").

. While our case law speaks of an affirmative interest in preserving the "appearance of impartiality,” we note it may be more correct to phrase the interest in the negative as "avoiding the appearance of impropriety,” similar to the ABA Model Code’s language. Under the latter phrasing, we assume actual impartiality exists, and the state has an additional interest in avoiding a negative appearance in the public's eye. Regardless of this technical distinction, we use the phrases "appearance of impartiality” and "avoiding the appearance of impropriety” interchangeably herein.

. Contrary to Judge Beam’s suggestion, a focus on public perception is not antithetical to our analysis of whether the interest is compelling. Post at 1044-46. Tellingly, Judge Beam cites no authority in support of the additional limitations he seeks to engraft onto the compelling interest inquiry. See generally White II, 416 F.3d at 749-50 (discussing the compelling interest determination). As set forth above, it should be of little dispute that having public confidence in the judiciary is an interest of the highest order. See Caperton, 129 S.Ct. at 2266 ("[The Codes of Judicial Conduct] are the principal safeguard against judicial campaign abuses that threaten to imperil public confidence in the fairness and integrity of the nation’s elected judges. This is a vital *1023 state interest.”) (internal quotation marks and citation omitted); see also Cox v. Louisiana, 379 U.S. 559, 565, 85 S.Ct 476, 13 L.Ed.2d 487 (1965) ("A State may also properly protect the judicial process from being misjudged in the minds of the public."). Even Wersal conceded Minnesota has a separate interest in maintaining the appearance of impartiality at oral argument before the panel in this matter.
Ultimately, the concern of the dissenting and concurring judges that maintaining the appearance of impartiality is a broadly defined state interest likely to infringe on candidates’ speech rights is misguided. One need look no further than White I to demonstrate this point. Once again, White I struck down the announce clause due to the lack of narrow tailoring, while implying the state had an interest in preserving the appearance of impartiality. 536 U.S. at 776, 122 S.Ct. 2528. As we discuss below, the present clauses are narrowly tailored, and thus this case is distinguishable. Therefore, our recognition of the state’s interest in preserving the appearance of impartiality does not in any way foreclose future challenges to clauses that "unnecessarily circumscribe protected expression.” Id. at 775, 122 S.Ct. 2528 (internal quotation marks and citation omitted).

. Because we ultimately conclude the challenged provisions are narrowly tailored to these compelling interests, we need not decide whether Minnesota's remaining asserted interests are compelling.

. Judge Beam incorrectly suggests the endorsement clause is underinclusive because it fails to regulate a candidate’s speech on a host of communications, including another candidate’s campaign platform and point of view on an issue. Post at 1046-47. Such restrictions would plainly be unconstitutional, however, pursuant to White I and White II. Thus, we are unpersuaded that the endorsement clause is unconstitutional because it fails to regulate other speech it could not constitutionally regulate.

. Minnesota’s decision to permit solicitations to groups of 20 or more people, which Wersal also now challenges, was in response to our discussion in White II. We find Wersal’s arguments based on this decision unavailing, because, as the district court con-eluded, ”[t]he setting of the group size at a minimum of twenty persons is not talismanic, but the inclusion of a number does not, by itself, establish an arbitrary political speech restriction.” Wersal, 607 F.Supp.2d at 1026.

. The dissenting judges frame the provision preventing a candidate's knowledge of a contributor’s identity as ineffective and underinclusive. Yet, the dissenting judges are largely silent regarding the import of White II to this case. Far from questioning the effectiveness of the knowledge provision, White II considered the provision to be the crux of its decision overturning the large group solicitation ban, because the candidate was unlikely to have any bias due to the fact the contributions were made to the candidate's committee and the committee was forbidden from disclosing the identity of contributors. 416 F.3d at 765. Likewise, the lack of a similar provision was central to the Sixth Circuit's decision in Carey, a case Judge Colloton relies heavily upon. See Carey, 614 F.3d at 205 ("If the purported risk addressed by the clause is that the judge or candidate will treat donors and non-donors differently, it is knowing who contributed and who balked that makes the difference[.]”). In fact, Carey expressly opined that a clause prohibiting in-person solicitations may be constitutional, as opposed to large group or mass-mailing solicitations. Id. at 206. The same can be inferred from White II.